Filed 11/25/14; pub. order 12/18/14 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| MICHAEL DANKO,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>TERRY O'REILLY,<br><br>    Defendant and Appellant. | A138784<br><br>(San Francisco City & County<br>Super. Ct. No. CGC-09-49503) |

One of the original Field Code provisions enacted in 1872 still states: "When jurisdiction is, by the Constitution or this Code, or by any other statute, conferred on a Court or judicial officer, all the means necessary to carry it into effect are also given; and in the exercise of this jurisdiction, if the course of proceeding be not specifically pointed out by this Code or the statute, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of this code." (Code Civ. Proc., § 187 (section 187).) Buried in this opaque language is the power of a trial court to amend a judgment by adding judgment debtors.

" 'Under section 187, the trial court is authorized to amend a judgment to add additional judgment debtors. . . . As a general rule, "a court may amend its judgment at any time so that the judgment will properly designate the real defendants." . . . Judgments may be amended to add additional judgment debtors on the ground that a person or entity is the alter ego of the original judgment debtor. . . . "Amendment of a judgment to add an alter ego 'is an equitable procedure based on the theory that the court is not amending the judgment to add a new defendant but is merely inserting the correct

1

name of the real defendant. . . . "Such a procedure is an appropriate and complete method by which to bind new . . . defendants where it can be demonstrated that in their capacity as alter ego of the corporation they in fact had control of the previous litigation, and thus were virtually represented in the lawsuit." . . .' . . ." [Citations.]' 'The decision to grant an amendment in such circumstances lies in the sound discretion of the trial court. "The greatest liberality is to be encouraged in the allowance of such amendments in order to see that justice is done." ' " (*Greenspan v. LADT, LLC* (2010) 191 Cal.App.4th 486, 508.)

The sole issue presented is whether the trial court here abused its discretion by amending a judgment against a dissolving law firm by adding a former name partner of that firm as an additional judgment debtor. We conclude not.

## BACKGROUND

From 1995 to 2009, plaintiff Michael Danko practiced law with defendant Terry O'Reilly, primarily in the firm of O'Reilly & Collins. The professional parting of Danko and O'Reilly was not amicable. In December 2009, Danko filed a complaint for damages against O'Reilly, as an individual, and O'Reilly & Collins. Among the causes of action alleged by Danko were: (1) breach of an oral contract of compensation; (2) quantum meruit; (3) indemnification of expenses; (4) discharge in violation of public policy; and (5) the statutory Labor Code penalty for willful failure to pay wages.[1]

Jury selection was completed and the actual trial commenced on June 13, 2012. After the court granted the motion of O'Reilly, the individual, for a directed verdict in his favor, the case was sent to the jury on July 2. The jury returned its special verdict the next day.

As to Danko's cause of action for breach of contract, the jury answered "yes" to these questions: "(1) Did Michael Danko and O'Reilly & Collins enter into a contract

---

[1] "If an employer willfully fails to pay . . . any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 20 days." (Lab. Code, § 203, subd. (a).)

2

pursuant to which Michael Danko would be compensated for services by a salary, 50% share of the amount of fees he generated and a discretionary bonus? (2) Did Michael Danko do all, or substantially all, of the significant things that the contract required him to do? (3) Did O'Reilly & Collins fail to do something that the contract required it to do? (4) Was Michael Danko harmed by that failure?" The jury fixed "Michael Danko's damages" at $2,400,000.

As to Danko's cause of action for quantum meruit, the jury answered "yes" to these questions: "(1) Was Michael Danko requested, by words or conduct, to perform services for the benefit of O'Reilly & Collins? (2) Did Michael Danko perform the services as requested? (3) Did O'Reilly & Collins fail to pay Michael Danko for the reasonable value of services provided?" The jury fixed "the amount of the reasonable value of Michael Danko's services that O'Reilly & Collins did not pay" at $2,400,000.

As to Danko's cause of action for discharge in violation of public policy, the jury answered "yes" to these questions: "(1) Was Michael Danko discharged from his employment? (2) Was O'Reilly & Collins' desire to avoid paying amounts due to Michael Danko a motivating reason for its decision to discharge him? (3) Did the discharge cause Michael Danko harm?" The jury fixed "Michael Danko's damages for being discharged in violation of public policy" at $2,400,000.

As to Danko's cause of action for "Waiting Time Penalties for Non Payment of Wages" (see fn. 1, *ante*), the jury answered "yes" to the question "Did O'Reilly & Collins willfully fail to pay Michael Danko any amounts identified in your answers [fixing damages in the causes of action for breach of contract, quantum meruit, and wrongful discharge ] . . . ?" The jury answered "no" to the question "Did O'Reilly & Collins have a good faith belief that no additional compensation beyond Michael Danko's salary was due?" The jury further found that Danko should recover $18,744 as "indemnification of expenses," and that he should receive prejudgment interest.

On July 11, 2012, judgment was entered in favor of Danko for "$2,418,744.00 in damages and expense reimbursement"; "Prejudgment interest on this amount . . . totaling $789,893.08"; and "Waiting time penalties pursuant to Labor Code section 203 in the

3

amount of $41,538.46."  The judgment further provided:  "Pursuant to this Court's order of June 29 2012, judgment is also entered in favor of Terry O'Reilly, an individual, and against Michael Danko on the following causes of action:  breach of contract, non-payment of wages, waiting time penalties, wrongful termination, . . . and quantum meruit."

Thereafter the trial court denied O'Reilly & Collins's motion for judgment notwithstanding the verdict,[2] and awarded Danko attorney fees of $1,230,609.50 and costs of $53,134.76.  O'Reilly was awarded $1,383 of the $17,846.70 costs he sought, and $72,285 of the $496,364.75 attorney fees he sought.

On November 13, 2012, Danko filed a motion to amend the judgment and the costs and fee order "to include Terry O'Reilly as a judgment debtor for all amounts owed to Michael Danko."  The basis for the motion was explained by Danko as follows:

"The jury found that, when he terminated Danko, O'Reilly *knew* that the firm owed Danko more than $2 million.  Nonetheless, at every opportunity O'Reilly drew out as personal distributions all the firm's available funds without reserving any amounts to satisfy the debt he knew was owed to Danko.  When O'Reilly reached the limits on the checks he could write to himself, O'Reilly began writing checks to others for his personal benefit, dropping the pretense that the sums were earned as 'salary.'  Thus, in a concerted effort to wring from the firm every last dollar, he wrote firm checks to others to:  build and furnish for him and his wife a luxury ranch in Idaho; buy expensive vintage cars here and abroad in furtherance of his racing hobby; buy fine wine, entertainment systems, and clothes; pay taxes and insurance on his home in San Francisco; fly around on private jets, take ski vacations, and travel to rugby matches; pay for vacations and shopping sprees for his current spouse; and fund his personal trust, and retirement accounts, and pay the living expenses of various family members.

"By the time of the verdict, O'Reilly had largely gutted the firm.  Once the verdict was in, he finished the job, transferring away the firm's unfinished cases to lawyer-

_____

[2] O'Reilly & Collins abandoned its motion for a new trial.

4

friends without obtaining anything in return for the firm.  Then, to make sure that Danko would indeed recover absolutely nothing, O'Reilly transferred to a third party, Credit Management Association (CMA) the few odd assets remaining that he was unable to convert for himself or give away to friends or family members.  The plan was complete.  In its October 11, 2012 correspondence to Danko, CMA could not have been more blunt: '**you will not be able to execute on any judgment**.'

"The law, however, does not countenance such manipulative abuse of a corporate form.  O'Reilly cannot shield himself from liability through the use of a corporate form, then ignore that corporate form and treat the corporation's assets as his own.  When presented with evidence of such conduct, the Court can and must equitably disregard the corporate form and hold O'Reilly to be the actual party in interest.  When as here, the shareholder has participated in and controlled his corporate alter ego's defense in a lawsuit, under Code of Civil Procedure section 187, the Court can and should amend the judgment against that corporate alter ego post-trial to name the miscreant shareholder as a direct judgment debtor."

Under the heading "O'Reilly Has Consistently Treated The O'Reilly Law Firm As His Personal Bank Account rather Than A Valid Separate Corporation," Danko marshaled evidence under six subheadings:  "O'Reilly Disregards Corporate Formalities"; "O'Reilly Treats Firm Assets as His Own"; "O'Reilly Made No Effort to Properly Capitalize the Firm or to Ensure that it could Pay its Debts"; "O'Reilly Manipulates the Firm's Books as it Suits Him"; "The Jury's Verdict is Based Solely on O'Reilly's Conduct"; and "O'Reilly Closes the Firm and Moves Money to Avoid Enforcement of the Judgment."

O'Reilly opposed Danko's motion to amend the judgment on several grounds.  O'Reilly initially argued that Danko's predicament was of his own making:  "Danko's collection efforts in this case required the firm to cease operations and assign all the assets for the benefit of creditors on October 8, 2012.  Danko then filed a petition to put the corporation into an involuntary bankruptcy proceeding. . . . [¶] As even Danko acknowledges, because the firm cannot financially continue to prosecute cases a

substantial amount of potential value to the firm, in the form of active pending cases, has been lost as a result of his actions. These very actions may prevent him from full dollar for dollar recovery from the corporation. In fact, despite his concerted efforts to prevent O'Reilly & Collins from continuing to generate cash to satisfy his judgment, it is estimated that well over $5.8 million will be made available to the assignee [i.e., CMA] to satisfy creditor claims, including Mr. Danko's. Mr. Danko has created the environment which he now complains may leave him unsatisfied. Under these circumstances the Court should not pierce the corporate veil" because "CCP 187 was not designed to remedy a problem caused by the creditor." Because "Danko is not an innocent third party," he "should be estopped from seeking to deny the corporate existence."

O'Reilly next argued that Danko's motion was "not timely" in that: "Plaintiff on the eve of trial attempted to amend the complaint to 'raise the issue' of alter ego. . . . Before and after the granting of the directed verdict [in favor of Terry O'Reilly] Plaintiff advised the court that he would move under Section 187 for an amendment to have the corporation declare[d] the alter ego of Mr. O'Reilly and have him added to any potential judgment. A verdict was rendered by the jury. Plaintiff did not seek to pursue his alter ego claim before he had the verdict become the judgment of the court. Nor did he ask the court to permit Plaintiff to put on additional evidence regarding his alter ego theories. Between the time of entry of judgment and his time to appeal the directed verdict portion of the judgment plaintiff did not apply to the court to have Mr. O'Reilly added to the judgment. The time to appeal ran and the judgment became final. Now Plaintiff brings this motion."

O'Reilly also argued that "res judicata bars the alter ego theory," and much of the chronology of trial events was mustered in support of this argument. Thus: "All of the fundamental facts offered in support of this motion were know[n] by Danko while he was still an employee of the firm. Based on that knowledge he belatedly tried to amend the complaint to raise the alter ego issues during trial. The motion to amend was denied. He put on, what he called sufficient evidence of his alter ego claim during trial . . . [¶] When

6

O'Reilly made his motion for a directed verdict, Danko's opposition was his alter ego theory, asserting corporate formalities were not honored, the corporation was undercapitalized, assets were comingled and money was shifted to personal accounts. Danko even argued that the evidence supporting alter ego <u>already admitted into evidence</u> was <u>compelling</u> and should provide a basis for denial of the directed verdict. Danko, by his own admission, litigated this issue, and he lost. Because he considered the evidence he introduced at trial was compelling on this issue, Danko can hardly now argue he did not have a meaningful opportunity to litigate the issue."

Beyond that, more than half of O'Reilly's written opposition was devoted to demonstrating that the various criteria for applying the alter ego doctrine were not proven by the evidence.

Danko's reply covered each of these points. His motion to amend was "timely and filed per the very postjudgment process contemplated by the parties at trial"; indeed, "the parties and this Court expressly acknowledged that the alter ego issue would be raised in this way (and not via presentation of this equitable issue to the jury)." "[T]he so-called 'estoppel' rationale in no way strips this Court of its Section 187 equity authority, and . . . fails to address the highly disproportionate magnitude and duration of O'Reilly's . . . manipulations and that they have gone on for years *after Danko left the firm*."

Danko asserted that O'Reilly's res judicata argument was "patently frivolous" "because the alter ego issues here were not actually litigated," and as those issues were equitable, they "could not have presented to the jury, and the parties expressly acknowledged that [they] would be presented as part of this post-judgment procedure to amend the very judgment in question." "O'Reilly's emphasis on Danko's underlying (and unsuccessful) effort to amend the complaint to add the alter ego theory at trial or passing reference to it in opposition to the Directed Verdict motion changes nothing. The Court expressly indicated that the claim was equitable and hence not properly part of the jury trial (expressly leaving it for later resolution by way of the section 187 process)."

As for the merits of the alter ego application, Danko maintained they were "clearly shown," while O'Reilly's opposition was "paltry." Moreover, "upholding the legal

7

fiction of O'Reilly & Collins as a separate firm would be wholly inequitable. The evidence and verdict clearly shows that Danko was entitled to $2.4 million, he was fired by O'Reilly to avoid paying that money, and O'Reilly subsequently took the money for himself and did (and is doing) everything he could to make sure that Danko would not be able to collect it."

After conducting a hearing at which it heard extensive argument, the trial court (Hon. Marla Miller) took the matter under submission. Judge Miller eventually filed a detailed eight-page written order granting Danko's motion to amend the judgment, which, as pertinent to this appeal, reads as follows (with minor nonsubstantive editorial changes added):

"<u>The motion is timely filed and not barred by res judicata</u>.

"The motion to amend judgment pursuant to CCP 187 is timely filed. A court may amend judgment to properly designate defendants at any time. (*Misik v. D'Arco* (2011) 197 Cal.App.4th 1065, 1074.) It is not necessary that alter ego doctrine be alleged or proved in the underlying lawsuit. (*Id*. at 1074-1075.)

"The motion is not barred by res judicata. Plaintiff made a motion to amend the complaint to add alter ego allegations on the eve of trial. The motion was opposed vigorously by Defendants. The motion was denied 'without prejudice to any further motion that might be made with regard to the evidence at any time, or the issue at any time, whether posttrial or at any time.' [Citing declaration of O'Reilly's counsel.]

"The alter ego issue was not litigated as part of the lawsuit. The complaint was not amended to include to include alter ego allegations; the parties expressly refrained from presenting evidence on the theory, and the Court and counsel acknowledged that the issue could be adjudicated post-judgment. [Citing declaration of Danko's counsel.] (See *United Bank & Trust Co. of California v. Hunt* (1934) 1 Cal.2d 340, 345 [party who allows issue or claim to be raised later is estopped to assert res judicata defense].) Further, alter ego is an equitable issue. The underlying issues were not presented to the jury for determination.

8

"When read fairly in context, Plaintiff's counsel's references to the untried alter ego allegations in connection with his opposition to Mr. O'Reilly's motion for directed verdict do not support the conclusion that the alter ego issue was, or could have been, litigated. In sum, the record reflects that the parties acknowledged that the alter ego issue would be presented as part of the post-judgment procedure to amend the judgment.

"Further, the effect of a section 187 motion to add a judgment debtor on alter ego grounds is 'not [to] add a new defendant but instead insert[] the correct name of the real defendant.' (*Misik v. D'Arco*, *supra,* 197 Cal.App.4th 1065, 1072.)"

"Estoppel.

"I find that Mr. Danko is not estopped from making the motion to amend the judgment.

"Danko has admitted that O'Reilly & Collins was technically a corporation and that he was technically employed by O'Reilly & Collins, a corporate entity. Danko had some knowledge of the financial affairs of the corporation when he was employed there, as a result of his various roles at the law firm. However, it was Mr. O'Reilly, and not Mr. Danko, who controlled the corporation as it was his own. Most importantly, Mr. Danko did not and could not control Mr. O'Reilly's actions after the jury verdict to use the corporate form to thwart Mr. Danko's ability to collect on his judgment. Mr. Danko's former status with the corporation is not a bar to his motion to amend the judgment under these circumstances.

"Mr. O'Reilly's contention that Mr. Danko condoned or 'personally engaged' in the same kind of conduct to the extent described above when he was employed by the firm is not supported by the evidence. Even if Mr. Danko had some personal expenses that were treated as income before he was terminated by Mr. O'Reilly, this is substantially different in degree and kind from the conduct described above undertaken by Mr. O'Reilly after the firm knew that it had a multi-million dollar judgment against it."

9

Then, under the heading "The Facts and Law Support Amending the Judgment," the "conduct described above" takes up most of the order, and in pertinent part reads as follows:

"I have taken into account all of the circumstances and find there is a unity of interest between Mr. O'Reilly and his firm. The evidence shows that there is commingling of funds and assets between the law firm and Mr. O'Reilly. Mr. O'Reilly used the firm to make payments to his son and former wife for no apparent business reason, and to deposit tens of thousands of dollars in his current wife's bank account. Since the trial, Mr. O'Reilly has entered into a transaction whereby the corporation is purportedly loaning hundreds of thousands of dollars to his personal trust, with no repayment of principal for 15 years. The corporation has spent tens of thousands of dollars for payment of Mr. O'Reilly and his wife's credit card bills, without promissory notes or interest.

"I find that Mr. O'Reilly has treated the corporation's assets as his own. (See *NEC Electronics, Inc. v. Hurt* (1989) 208 Cal.App.3d 772, 776.) The payments on the credit cards include substantial amounts for personal items such as luxury vacations, clothing and wine. The corporation has paid for trips to rugby tournaments, personal property taxes, and thousands of dollars to purchase, transport, and repair vintage cars for Mr. O'Reilly's personal use. The law firm has paid more than $100,000 to remodel ranch property in Idaho for Mr. O'Reilly, an expense apparently carried on the firm's balance sheets as 'building improvements,' but now transferred to Mr. O'Reilly's personal trust in exchange for an unsecured promissory note with no principal payments until 2027. Any amounts paid on the note are to be paid directly to law firm's bank to pay down the line of credit, further keeping those funds out of the corporation. As to this promissory note, the law firm's long-time bookkeeper testified at a postjudgment examination that she did not recall ever having seen the promissory note before and that she did not know its purpose, further suggesting the commingling of assets between the corporation and Mr. O'Reilly, Mr. O'Reilly's singular control over the corporation's assets, and the nonobservance of corporate form.

"A further factor supporting the motion is the inadequate capitalization or lack of corporate assets. This is evidenced in the correspondence between Mr. O'Reilly and the firm's long-time banker in the context of denying Mr. O'Reilly a second 'business' line of credit, and the bank's view that Mr. O'Reilly and the law firm are 'one in the same.'

"A further factor is the disregard of corporate formalities. For example, Mr. O'Reilly paid attorney Mr. Collins for shares that were not issued, and made him a director of the firm although he was not a shareholder. Mr. O'Reilly filed records that failed to identify Mr. Danko as a shareholder.

"Another factor supporting the motion is Mr. O'Reilly's control and dominance of the corporate entity. He had complete control over the firm's finances. As set forth above, he entered into significant transactions, such as loans to this trust, even without the knowledge of the firm's long-time bookkeeper. Further, as I have already found, Mr. O'Reilly was a founder and majority shareholder of the law firm, and the person who made and caused the breach of the agreement with Mr. Danko that was the focus of this trial.

"An additional factor supporting amendment of the judgment is the manipulation or diversion of assets from a corporation to a stockholder to the detriment of creditors. (*NEC Electronics, Inc. v. Hurt*, *supra,* 208 Cal.App.3d 772, 777-786.) The evidence described above supports this finding.

"Mr. O'Reilly's interests were adequately represented in the litigation, and he personally controlled it. As set forth in more detail in the Fee Order, Mr. O'Reilly and his law firm presented a joint defense throughout the trial. [3]

"Having found a 'unity of interest' between Mr. O'Reilly and the law firm, I also find that Mr. Danko has met his burden that there will be an unjust or inequitable result if

---

[3] In that order, Judge Miller had stated: "O'Reilly as an individual, and his law firm, presented a joint defense throughout the trial. They filed a joint answer. Almost all of the defense pretrial motions, case management statements, and trial motions were filed jointly, except for one motion in limine and the directed verdict motion. There was no differentiation between defendants in questioning witnesses at trial."

11

the legal fiction of a separate corporation is upheld.  Mr. O'Reilly himself was responsible for the conduct underlying Danko's claims against the law firm.  Rather than satisfy the judgment from the law firm's assets, these assets were used for personal expenditures as set forth above.  Many of the assets of the corporation have now been transferred as described above, including the amount owed by Mr. O'Reilly represented by an unsecured note in excess of $400,000 not payable until 2027.

"Contrary to Mr. O'Reilly's argument, I find that this conduct amounts to more than a creditor simply having 'difficulty in enforcing a judgment.'  (Cf. *Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 539.)

"Mr. O'Reilly attempts to defeat the motion to amend judgment by blaming the firm's present conduct on Mr. Danko's 'aggressive collection efforts.'  This judgment rings hollow and is without merit.  This is not a basis to deny a motion to amend judgment."

In conformity with this order, an amended judgment was filed on March 29, 2013.

On April 3, a "Notice of Bankruptcy Filing, Appointment of Chapter 7 Trustee on Behalf of O'Reilly & Collins and of Automatic Stay Pursuant to 11 U.S.C. § 362(a)" was filed with the trial court by attorneys for the trustee.  This document recited that "on February 4, 2013, an Order for Relief under Chapter 7 . . . on behalf of O'Reilly & Collins was entered by the United States Bankruptcy Court for the Northern District of California"; that a trustee "of the estate of O'Reilly & Collins" had been appointed; and that "based on the applicability of the automatic stay, any attempts to obtain a judgment or enforce a judgment against Defendant Terry O'Reilly for claims based on fraudulent conveyance and/or alter ego, are property of the bankruptcy estate and subject to the stay imposed under 11 U.S.C. § 362(a)(3)."

On May 24, O'Reilly filed a notice of appeal from the amended judgment.

## REVIEW

Although a reporter's transcript of the lengthy trial is bound into the clerk's transcript, there is no need to summarize that evidence because, on this appeal, O'Reilly advances three contentions all of which involve pure questions of law concerning only

12

Judge Miller's decision to grant Danko's motion to amend. The same is true with respect to Judge Miller's finding that O'Reilly was the alter ego of O'Reilly & Collins, as it was the product of a number of factual determinations quoted above, which finding will be upheld on appeal if it is supported by substantial evidence. (E.g., *Carolina Casualty Ins. Co. v. L.M. Ross Law Group, LLP* (2012) 212 Cal.App.4th 1181, 1189; *Misik v. D'Arco*, *supra*, 197 Cal.App.4th 1065, 1071-1072.) Because O'Reilly does not challenge that finding, it is unnecessary to explore the evidence submitted in connection with Danko's motion to amend the judgment.

Judge Miller's decision can be reversed only if we conclude Judge Miller abused her discretion under section 187 in allowing the amendment. (See *Carolina Casualty Ins. Co. v. L.M. Ross Law Group, LLP*, *supra,* 212 Cal.App.4th 1181 at p. 1189 and authorities cited.)

We therefore proceed to the three legal grounds on which O'Reilly believes the decision to amend the judgment is vulnerable, which are: (1) the amendment was entered in violation of the bankruptcy court's stay; (2) the amendment was precluded by the doctrine of res judicata; and (3) the amendment was contrary to the principles governing collateral estoppel. And conclude they all lack merit.

### Violation Of The Bankruptcy Stay

Federal law specifies that the filing of a bankruptcy petition operates as an automatic stay of "the commencement or continuation . . . of a judicial . . . action against the debtor that was or could have been commenced" prior to the filing of the petition. (11 U.S.C. § 362(a)(1).) O'Reilly's first contention is framed as follows: "Danko's amended judgment is void because it arose out of and was founded upon an injury to the debtor [i.e., O'Reilly & Collins] and therefore violated the automatic stay."

Before demonstrating why this contention is without merit, we address a housekeeping matter. During the pendency of this appeal, no fewer that five requests for judicial notice—three from O'Reilly and two from Danko—have been submitted. So far, only Danko's first request has been granted; the other four await a ruling. We now grant all those requests.

13

The subject of all the requests is some events evidenced by documents in the O'Reilly & Collins bankruptcy. In chronological order, the documents are: (1) the involuntary bankruptcy petition filed on October 25, 2012 against O'Reilly & Collins by Danko and other creditors; (2) Danko's motion filed April 12, 2013 for an order from the bankruptcy court that the automatic stay "is inapplicable to Michael S. Danko's judgment and his underlying claims against Terry O'Reilly"; (3) the trustee's written opposition to that motion dated May 3, 2013; (4) a reporter's transcript of the May 10, 2013 hearing held on that motion; (5) the denial of that motion on May 15, 2013; (6) a "Stipulation for Partial Settlement of Bankruptcy case Issues" dated March 12, 2014; (7) the proof of claim filed by Terence O'Reilly as a creditor of O'Reilly & Collins on June 20, 2013; (8) the bankruptcy court's order of July 17, 2014 approving the settlement; (9) the bankruptcy's court's order of that same day "denying Creditor Terry O'Reilly's Motion for an Order Declaring Danko's Amended Judgment to be Void"; (10) a reporter's transcript of the June 25, 2014 hearing held on both motions; (11) a district court order dated August 14, 2014 denying O'Reilly's motion for a stay of that order; and (12) O'Reilly's notice of appeal dated August 15, 2014, of that order to the Ninth Circuit.

Several features of these documents deserve mention. In the stipulated settlement, the trustee and Danko emphasize in a prefatory recital that: "At no time prior to the entry of the Amended Judgment did O'Reilly raise any objection or in any way suggest that the automatic stay arising from the filing of the Bankruptcy Case may in any way be applicable to the 187 Motion." Among the stipulated provisions were termination of the automatic stay, and "the Trustee did not assert that the entry of the Amended Judgment violated the automatic stay."

The bankruptcy court's order approving the settlement included the following: "Relief from the automatic stay of 11 USC § 362(a) shall be effective as of the October 25, 2012 petition date, concerning any and all enforcement actions against Mr. O'Reilly in *Danko v. O'Reilly et al.*, San Francisco County Superior Court, Case No. CGC-09-495203, *including the entry of the amended judgment against Mr. O'Reilly* on or about March 29, 2013 . . . ." (Italics added.)

14

And when it denied O'Reilly's motion for a stay of the bankruptcy court's order approving the settlement, the district court stated: "O'Reilly fails to show that he seeks application of the automatic stay against Danko's amended judgment in his role as a creditor of the estate, or for the purpose of protecting assets of the estate for distribution to creditors. Rather, O'Reilly seeks to void the amended judgment for his own benefit to bar Danko from pursuing the state court amended judgment against O'Reilly personally. Based on the court's familiarity with the facts and allegations underlying Danko's amended judgment, . . . the court determines O'Reilly invokes the protection of the automatic stay here not in his role as a creditor of the bankruptcy estate, but as a judgment debtor of Danko. Thus, O'Reilly has failed to show a reasonable probability of success on his argument that he has statutory standing to challenge the alleged violation of the automatic stay."

Next, under the heading "Bankruptcy Court's Authority to Grant retroactive Relief from Stay," the district court concluded: "To address O'Reilly's argument that a judgment obtained in violation of the automatic stay is void and cannot be revived, Danko responds that section 362(d), a subsection of the automatic stay provision, gives the bankruptcy court the power to grant creditors relief from the stay. (*See Schwartz v. United States* (9th Cir. 1992) 954 F.2d 569, 572 ['section 362(d) gives the bankruptcy court wide latitude in crafting relief from the automatic stay, including the power to grant retroactive relief from the stay'].) O'Reilly cites *In re Schwartz* as authority that acts in violation of the stay are void, not merely voidable, in support of his argument that the bankruptcy court could not 'revive' a void judgment obtained in violation of the automatic stay. (*Id.* at p. 571.) However, the court in *In re Schwartz* reasoned that the bankruptcy court's authority under § 362(d) to make exceptions to the general operation of the stay 'is not inconsistent with the conclusion that any action in violation of the automatic stay is void and of no effect.' (*Id.* at pp. 572–573.) The Ninth Circuit held that 'if a creditor obtains retroactive relief from stay under section 362(d), there is no violation of the automatic stay, and whether violations of the stay are void or voidable is not at issue.' (*Id.* at p. 573.) Thus, O'Reilly is not likely to prevail on his argument that

15

the bankruptcy court abused its discretion by approving the compromise agreement, thereby allowing Danko to enforce the amended judgment against O'Reilly personally."

O'Reilly can point to sources that state the general proposition that any judicial action in violation of the automatic stay is "void." (E.g., *In re Schwarz* (9th Cir. 1992) 954 F.3d 569, 571; *Sindler v. Brennan* (2003) 105 Cal.App.4th 1350, 1353; *In re Marriage of Sprague & Spiegel-Sprague* (2003) 105 Cal.App.4th 215, 219.) But the danger of such broad statements is that they often do not convey exceptions, caveats, or limitations. So it is here.

In arguing that the amended judgment was made in violation of the automatic stay—and is therefore perpetually "void"—O'Reilly is retracing the same argument rejected by the trustee, the bankruptcy court, and the district court. They are not alone.

The leading bankruptcy authority states: "As a general rule, actions taken in violation will be either . . . void or voidable. . . ." (2 Collier Bankruptcy Practice Guide (2012) ¶ 38.02[5], p. 38-14.) And: "The automatic stay does not, however, apply to nondebtor entities such as corporate affiliates, *corporate officers*, *codefendants*, guarantors or general partners." (*Id*., ¶ 38.01, p. 38-3, italics added.) Thus, as the district court recognized, not every apparent violation of the stay is invariably fatal.

Nor, as California recognizes, is the violation of a bankruptcy stay a sword in the hands of "nondebtor entities" such as O'Reilly. That recognition has existed for many years. In 1988, Division Three of this District held: "It is fundamental under federal bankruptcy law that the automatic stay operates for the benefit of the debtor and trustee only, and gives other parties interested in property affected by the automatic stay no substantive or procedural rights. [Citations.] *If the debtor or trustee chooses not to invoke the protections of the automatic stay, no other party may attack any act in violation of the automatic stay.*" (*Campbell v. Lauigan* (1988) 202 Cal.App.3d 651, 658, italics added; accord, *Shorr v. Kind* (1991) 1 Cal.App.4th 249, 258.) Division Three cited our Supreme Court's statement in *Beck v. Unruh* (1951) 37 Cal.2d 148, 153, that a party other than the debtor or the trustee "is not in a position to complain of the flaunting of the claimed authority of the bankruptcy court which that court did not choose to exercise

16

. . . ." (*Campbell v. Lauigan, supra,* at p. 658, italics omitted.)  The Ninth Circuit agreed, in strikingly similar terms:  "Language from many cases indicates that, if the trustee does not seek to enforce the protections of the automatic stay, no other party may challenge acts purportedly in violation of the automatic stay."  (*In re Pecan Groves of Arizona* (9th Cir. 1991) 951 F.2d 242, 245.)

O'Reilly is seeking to vindicate the dignity of the bankruptcy court's order.  Although the bankruptcy court might initially have been sympathetic to this view when it denied Danko's motion to hold that the amended judgment was outside the stay, the court ultimately came to the opposite conclusion.  The trustee did not seek to void the amended judgment, but, on the contrary, treated it as legitimate by including it in the settlement.  The bankruptcy court agreed, not only when it approved the settlement, but also when it denied O'Reilly's motion to declare the amended judgment to be void.  And the district court agreed as well, in the language quoted above rejecting the identical argument O'Reilly now reiterates—for the fourth time.  And which we join with these other courts in rejecting.

### Res Judicata and Collateral Estoppel

O'Reilly contends the amended judgment is vulnerable because it violated the doctrines of res judicata and collateral estoppel. Because the two doctrines overlap, they will be addressed together.

" 'As generally understood, "[t]he doctrine of res judicata gives certain conclusive effect to a former judgment in subsequent litigation involving the same controversy." [Citation.]  The doctrine "has a double aspect." [Citation.]  "In its primary aspect," commonly known as claim preclusion, it operates as a bar to the maintenance of a second suit between the same parties on the same cause of action.  [Citation.]" [Citation.]  "In its secondary aspect," commonly known as collateral estoppel, "[t]he prior judgment . . . 'operates' in "a second suit . . . based on a different cause of action . . . 'as an estoppel or conclusive adjudication as to such issues in the second action as were actually litigated and determined in the first action.' [Citation.]"  "The prequisite elements for applying the doctrine to either an entire cause of action or one or more issues are the same:  (1) A

17

claim or issue raised in the present action is identical to a claim or issue litigated in a prior proceeding; (2) the prior proceeding resulted in a final judgment on the merits; and (3) the party against whom the doctrine is being asserted was a party or in privity with a party to the prior proceeding." [Citation.]' " (*Boeken v. Philip Morris USA, Inc*. (2010) 48 Cal.4th 788, 797, italics omitted.)

The obvious difficulty is that the situation here is not one where there was "a prior proceeding." O'Reilly insists this initial impression is erroneous. He maintains that when Danko did not perfect a timely appeal from the original judgment entered on July 11, 2012, against O'Reilly & Collins, that judgment—including the directed verdict in favor of O'Reilly as an individual—had become final by the time that judgment was purportedly amended in March 2013. And, so the argument runs, the amendment proceedings thus qualified as the initiation of a second action, a renewed effort by Danko to hold O'Reilly personally liable. We see things differently.

The doctrines of res judicata and collateral estoppel are " 'not to be applied with the hypertechnical and archaic approach of a nineteenth century pleading book, but with realism and rationality.' [Citations.] Accordingly, the public policies underlying [the doctrines] . . . strongly influence whether its application in a particular circumstance would be fair to the parties and constitutes sound judicial policy." (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 343 [collateral estoppel]; see *Hight v. Hight* (1977) 67 Cal.App.3d 498, 502 ["The court is empowered to refuse to apply the doctrine [of res judicata] . . . to prevent defeat of the ends of justice"].) The doctrines are not meant to become the tools of inequitable or unjust results. (E.g., *Kopp v. Fair Political Practices Commission* (1995) 11 Cal.4th 607, 620-622; *City of Sacramento v. State of California* (1990) 50 Cal.3d 51, 64.) The purpose and goals of section 187 are the same. (E.g., *Wells Fargo Bank, National Assn. v. Weinberg* (2014) 227 Cal.App.4th 1, 7; *Misik v. D'Arco*, *supra*, 197 Cal.App.4th 1065, 1073; *Greenspan v. LADT, LLC*, *supra*, 191 Cal.App.4th 486, 508.)

We quoted the entirety of Judge Miller's reasoning as to why Danko's motion to amend was "timely filed" to establish that the issue of O'Reilly being the alter ego of

O'Reilly & Collins did not emerge at the end of the trial, but, on the contrary, infused the proceedings from inception. And, it must be noted, with the agreement of both sides,[4] the issue was reserved for decision after the jury phase of the trial was conducted. Because the alter ego issue was reserved, it was not encompassed in the original judgment, which therefore was not final for purposes of either res judicata or collateral estoppel. (E.g., *Stark v. Coker* (1942) 20 Cal.2d 839, 843 ["when it affirmatively appears that an issue was not determined . . . it obviously is not res judicata upon that issue. A judgment is not an adjudication as to matters that the court expressly refrains from determining."]; 7 Witkin, Cal. Procedure (5th ed. 2007) Judgment, §§ 363, p. 985 ["The doctrine of res judicata applies only to judgments . . . that are final in the sense that no further judicial act remains to be done to end the litigation."], 430, p. 1081 ["If the parties expressly exclude a particular issue from consideration, or the court expressly refrains from determining it, no collateral estoppel results."]).[5]

Moreover, the alter ego issue did not qualify as either " ' "the same cause of action" ' " or " ' "a different cause of action" ' " that would activate the protection of res judicata or collateral estoppel. (*Boeken v. Philip Morris USA, Inc*., *supra,* 48 Cal.4th 788, 797.) *Wells Fargo Bank, National Assn. v. Weinberg*, *supra*, 227 Cal.App.4th 1, 7 is illustrative of this principle with facts strikingly similar to the situation here.

Wells Fargo sued attorney Weinberg and his law firm for repayment of $57,000 from a business line of credit. Only the law firm was adjudged liable. Wells Fargo then

---

[4] O'Reilly states he never agreed that the alter ego issue could be adjudicated by a post-judgment motion. Judge Miller reached the opposite conclusion and her conclusion has the support of substantial evidence, in the form of the trial attorneys' declarations cited in her decision. Even if Judge Miller's conclusion was erroneous as a matter of fact, it would not impair her power as a matter of law to entertain and grant the motion to amend.

[5] Moreover, in the spirit of " 'realism and rationality' " (*Lucido v. Superior Court*, *supra*, 51 Cal.3d 335, 341), we are unsure how Danko could have prosecuted an appeal when the issue of O'Reilly's personal liability was still pending. Moreover, because Danko has not appealed from the amended judgment on the ground that the jury's damages were inadequate, in can be inferred that he has never been dissatisfied with the jury's verdict.

moved to have the judgment amended to add Weinberg as a judgment debtor. This was granted by the trial court. The Court of Appeal affirmed, rejecting Weinberg's contention that the amendment was improper:

"Weinberg's primary argument is that res judicata bars Wells Fargo's amendment of the judgment because the trial court's ruling sustaining Weinberg's demurrer without leave to amend determined as a matter of law that Weinberg was not liable for the law corporation's debts on any theory—including alter ego—that could have been raised in the complaint. We disagree that res judicata applies. [¶] . . . [¶]

"Res judicata also does not operate because Weinberg's alter ego conduct was a separate and distinct harm from the law corporation's breach of contract. The motion to add Weinberg to the judgment sought a remedy, not for breach of contract, but for Weinberg's exercise of control over the law corporation that deprived Wells Fargo of the ability to collect the judgment against the law corporation for breach of contract. These are separate and distinct wrongs. . . . .

"Res judicata and collateral estoppel did not preclude Wells Fargo from conducting a judgment debtor examination of Weinberg or from seeking to add him as a judgment debtor under Code of Civil Procedure section 187 on an alter ego theory: ' "A claim against a defendant, based on the alter ego theory, is not itself a claim for substantive relief . . . , but rather, procedural, i.e., to disregard the corporate entity as a distinct defendant and to hold the alter ego individuals liable on the obligations of the corporation where the corporate form is being used by the individuals to escape personal liability, sanction a fraud, or promote injustice." ' [Citation.] Amending judgments under Code of Civil Procedure section 187 is an equitable procedure. [Citation.] Because Wells Fargo is not seeking new relief but to enforce its judgment, res judicata does not apply." (*Wells Fargo Bank, National Assn. v. Weinberg*, *supra*, 227 Cal.App.4th 1, 6-8.)[6]

---

[6] *Carolina Casualty Ins. Co. v. L. M. Ross Law Group, LLP*, *supra*, 212 Cal.App.4th 1181 is another recent instance of a judgment against a bankrupt law firm being amended to name the dominant individual lawyer as a judgment debtor. We

20

So too with Danko.  He was not looking to increase the amount of the judgment. (See fn. 5, *ante*.)  The proposed amendment was unrelated to the liability determinations made at trial.  (See *Greenspan v. LADT, LLC*, *supra*, 191 Cal.App.4th 486, 516.)  And Danko's papers made it explicit that O'Reilly was continuing to "finish[] the job . . . to make sure that Danko would . . . recover absolutely nothing."

O'Reilly does not challenge any of the myriad of factual determinations made by Judge Miller in connection with her decision to amend the judgment.  She had abundant exposure to O'Reilly, and thus the opportunity to take his measure.  And she expressly concluded that "Mr. O'Reilly himself was responsible for the conduct underlying Danko's claims against the law firm," and "Mr. Danko has met his burden that there will be an unjust or inequitable result if the legal fiction of a separate corporation is upheld." Moreover, Judge Miller was obviously of the opinion that amending the judgment was necessary and proper to prevent " ' "the corporate form [from]being used by the individual[] to escape personal liability, sanction a fraud, or promote injustice." ' " (*Wells Fargo Bank, National Assn. v. Weinberg*, *supra*, 227 Cal.App.4th 1, 7.) Judge Miller's decision may be overturned only if O'Reilly can demonstrate that it was an abuse of the discretion granted by section 187.  (*Carolina Casualty Ins. Co. v. L.M. Ross Law Group, LLP*, *supra*, 212 Cal.App.4th 1181, 1189.)  This, he has failed to do.

## DISPOSITION

The amended judgment is affirmed.

---

note that the amendment there was allowed two years after entry of the original judgment, and after that judgment had been affirmed on appeal.  (*Id*. at pp. 1186-1188.) Unlike *Weinberg*, there was no discussion of res judicata.

                            _____

                            Richman, J.

We concur:


_____

Kline, P.J.


_____

Stewart, J.

Filed 12/18/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| MICHAEL DANKO,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>TERRY O'REILLY,<br><br>        Defendant and Appellant. | A138784<br><br>(San Francisco City & County<br>Super. Ct. No. CGC-09-49503) |

**THE COURT:**

        The opinion in the above-entitled matter filed on November 25, 2014, was not certified for publication in the Official Reports.  For good cause appearing and pursuant to California Rules of Court, rule 8.1105, the opinion in the above-entitled matter is ordered certified for publication in the Official Reports.


Dated: _____                    _____

                                                          Kline, P.J.

| | |
|---|---|
| Trial Court: | Superior Court of the City and County of San Francisco |
| Trial Judge: | Honorable Marla J. Miller |
| Attorney for Defendant and Appellant: | Cooper, White, & Cooper, William H.G. Norman, Scott M. McLeod |
| Attorneys for Plaintiff and Respondent: | Kerr & Wagstaffe, Michael Von Loewenfeldt, Kelly Corcoran |