Filed: 4/20/23  Harris v. Gilliam CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| LYDIA HARRIS,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>KEVIN GILLIAM,<br><br>    Defendant;<br><br>WASSERMAN, COMDEN & CASSELMAN,<br><br>    Third Party Claimant and Respondent. | B320824<br><br>(Los Angeles County Super. Ct. No. BC268857) |

APPEAL from a judgment of the Superior Court of Los Angeles County, David Sotello, Judge.  Affirmed.

Dermot Givens for Plaintiff and Appellant.

Law Offices of Peter Q. Ezzell and Nancy Lucas Ezzell for Third Party Claimant and Respondent.

———————————————————

Lydia Harris and her wholly owned record company, New Image Media Corp., represented by the law firm then-named Wasserman, Comden, Casselman & Pearson, LLP (Wasserman firm), obtained a default judgment for $107 million against Marion "Suge" Knight and Death Row Records in March 2005 based on Harris's allegation she had been the victim of a conspiracy to deprive her of a 50 percent ownership interest in Death Row Records. Seventeen years later, on March 14, 2022, Harris, represented by Dermot Givens, Knight and Death Row Records' former counsel in the litigation, moved pursuant to Code of Civil Procedure section 473, subdivision (d),[1] to set aside as void the judgment entered in her favor. Harris contended the superior court lacked jurisdiction over her 2002 lawsuit because the claims asserted were an asset of her bankruptcy estate and could only have been pursued by the bankruptcy trustee in federal bankruptcy court—an argument previously rejected on multiple occasions because the bankruptcy trustee had ratified the 2005 judgment through settlements, approved by the bankruptcy court, with Knight's and Death Row Records' bankruptcy estates. The court denied Harris's motion, finding nothing in Harris's papers that indicated those prior rulings were incorrect. We affirm.

---

[1] Statutory references are to this code unless otherwise stated.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Harris's Bankruptcy Proceedings*

Death Row Records was founded in 1991 by, among others, Knight and Harris's former husband, Michael Harris.[2] Harris on May 17, 1996 filed a voluntary petition in bankruptcy court under chapter 7 of title 11 of the United States Code. She did not list as an asset her claimed 50 percent ownership interest in Death Row Records. Harris was denied a discharge on July 21, 1997, and the case was closed without administration of any assets on December 15, 1999.

2. *The 2002 Death Row Litigation, Default Judgment, Secret Partial Settlement and the Attorney Lien Litigation*

Harris and the Wasserman firm entered into a contingency fee retainer agreement in January 2002 providing the law firm would receive 40 percent of any recovery from Harris's lawsuit asserting her ownership interest in Death Row Records. The lawsuit was filed in February 2002 against Knight, Death Row Records and others (Death Row litigation). After striking the answer of Knight and Death Row Records for a series of discovery violations, the trial court entered their default and on March 9, 2005, following a prove-up hearing, a judgment in favor of Harris and New Image Media and against Knight and Death Row Records for $107 million ($45 million for economic damages,

---

[2] Lydia and Michael Harris's marriage was dissolved in 2005.

3

$2 million for noneconomic damages and $60 million for punitive damages).[3]  No appeal was taken from the judgment.

Harris discharged the Wasserman firm on May 19, 2005, indicating on her substitution of counsel form that she would be representing herself in the Death Row litigation.  The Wasserman firm filed a notice of attorney fee lien the same day.

The following week Knight, acting through attorney Givens, paid Harris $1 million ($10,000 on May 20 and $990,000 on May 27, 2005) in (partial) satisfaction of the $107 million judgment in the Death Row litigation.  The Wasserman firm contended in a lawsuit filed against Harris, Givens and others (*Wasserman, Comden, Casselman & Pearson, LLP v. Harris* (Super. Ct. L.A. County, 2005, No. BC340196) (attorney lien litigation)) that it was unaware of the payment to Harris when made and that, in providing the payment, Givens had ignored the Wasserman firm's attorney fee lien and interfered with its right to collect fees pursuant to its retainer agreement with Harris.

Following a bench trial in July 2007 in the attorney lien litigation,[4] the court found the Wasserman firm's lien was valid and the firm was entitled to its lien on any recovery in the Death Row litigation.  The court further found that Givens, aware of the

---

[3]     Prior to the default and default judgment, the court had entered judgment in favor of Interscope Records and two of its executives, named as defendants by Harris, after granting their motion for summary judgment. We affirmed that judgment on appeal. (*Harris v. Interscope Records* (June 9, 2004, B166253) [nonpub. opn.].)

[4]     Prior to the bench trial the Wasserman firm settled its claims with Harris.  Its claims against defendants other than Givens were severed due to pending bankruptcy proceedings.

lien, "intentionally and with malicious intent to deprive [the Wasserman firm] of [its] earned attorney fees, unethically ignored the fee lien while lying to Ms. Harris that [the Wasserman firm] was not entitled to [its] lien and saying 'obviously we won't be paying them any money.'" After denying Givens's motion for a new trial, which argued the judgment in the Death Row litigation and the Wasserman firm's retainer agreement were invalid because the bankruptcy court had exclusive jurisdiction over Harris's claim to an ownership interest in Death Row Records, the trial court on April 30, 2008 entered judgment awarding the Wasserman firm $805,752 in compensatory damages and $250,000 in punitive damages against Givens. Givens did not appeal the judgment.

Beginning in November 2007, following the bench trial in the attorney lien case, and continuing through mid-2008, Givens filed a series of motions to intervene and to set aside the judgment in the Death Row litigation on which the Wasserman firm's tort claims against him were based. Givens argued the Harris bankruptcy proceeding created a "judicial estoppel" that precluded the superior court's exercise of jurisdiction over Harris's claims.[5]

On June 25, 2008 the Harris bankruptcy trustee, who had been reappointed after learning of the 2005 judgment in the Death Row litigation, filed an opposition to the last of Givens's successive motions to intervene. In addition to arguing that Givens, as a third party stranger to the litigation, had no

---

[5]     As a condition to entering settlement discussions in 2005, Givens's clients, Knight and Death Row Records, waived their right to attack the judgment.

5

standing to attack the judgment, the trustee explained that approximately $50 million of the $107 million judgment resulted from post-petition claims as to which Harris was the sole real party in interest: "Had [Harris] listed the pre-petition claim as an asset, this action would still have proceeded. It would likely have been prosecuted jointly by [Harris] (as owner of the post-petition claims) and the Trustee (as owner of the pre-petition claims) as co-plaintiffs[,] and there is no reason to believe the result would have been any different." The trustee noted that a tentative agreement had been reached between Harris and the trustee as to their respective interests in the judgment.

The Wasserman firm, as lien claimant, also filed an opposition to Givens's motions. Givens's serial motions to intervene were all denied.

3. *Additional Bankruptcy Court Proceedings*

In April 2006 Knight and Death Row Records each filed voluntary petitions for relief in bankruptcy court under chapter 11 of title 11 of the United States Code. Harris filed proofs of claim in both bankruptcy proceedings based on the $107 million judgment in the Death Row litigation.

Harris's earlier bankruptcy case was reopened on August 21, 2007; and, as discussed, the former trustee was reappointed after learning of Harris's $107 million judgment, which the trustee believed may have involved rights existing when Harris filed her bankruptcy petition in 1996.

Adversary proceedings were initiated by Knight as debtor-in-possession and Death Row Records as debtor-in-possession in the Knight bankruptcy case against Harris seeking to declare the judgment in the Death Row litigation satisfied or to disallow the judgment under various theories and by Harris seeking to declare

6

the judgment a nondischargeable debt. Following mediation the parties settled the dispute, effective February 6, 2008. Under the terms of the settlement among Harris, her former husband and the trustees of the Harris, Knight and Death Row Records bankruptcy estates, a portion of Harris's proof of claim in the Knight and Death Row Records bankruptcy proceeds was allowed, in part as an unsecured claim and in part as a subordinated claim. In addition, in consideration of, and subject to, the terms of their agreement, the trustee of Harris's chapter 7 bankruptcy estate fully released the Death Row Records trustee, the Death Row Records estate, the Knight trustee and the Knight estate from all claims, causes of action, obligations and liabilities. Harris personally agreed to a general release of all claims she might have relating to the matters addressed in the settlement agreement. The settlement was approved by the bankruptcy court on June 9, 2008.

In November 2014 the bankruptcy court approved a settlement among Harris, the Wasserman firm, the trustee of the Harris estate and others that resolved the Wasserman firm's fee claim. The reopened bankruptcy proceeding for Harris's estate was closed on December 17, 2015.

4. *Givens's Efforts To Assert Bankruptcy Court Jurisdiction over the Wasserman Firm's Claims*

In September 2007 and early 2008 Givens attempted to remove the attorney lien litigation to the bankruptcy court. The case was remanded on both occasions.

In November 2008 Givens filed a lawsuit against the Wasserman firm for intentional and negligent misrepresentation, asserting the firm had misrepresented its authority to enter into the retainer agreement with Harris and to pursue the Death Row

7

litigation on her behalf because Harris's claim to an ownership interest in the record label belonged to her bankruptcy estate. Givens dismissed the action in response to the Wasserman firm's special motion to strike pursuant to Code of Civil Procedure section 425.16.

In February 2015 Givens moved to set aside the judgment in the attorney lien litigation as void pursuant to section 473, subdivision (d), arguing the retainer agreement and subsequent attorney fee lien were invalid because Harris's claim to an ownership interest in Death Row Records was a prepetition claim and only the Harris bankruptcy trustee was authorized to pursue it. The court denied the motion in May 2015, and in September 2015 it denied Givens's motion for reconsideration. Our colleagues in Division Four of this court affirmed the order denying the motion to set aside, holding, even if the contract between Harris and the Wasserman firm was void or voidable, that would not constitute a jurisdictional defect in the Wasserman firm's action against Givens. (*Wasserman, Comden, Casselman & Pearson, LLP v. Givens* (Mar. 29, 2017, B268664) [nonpub. opn.].)[6]

Givens filed another lawsuit in November 2017, this time in federal court, seeking a declaration that the Wasserman firm

_____

[6] Givens also contended the automatic stay in the reopened Harris bankruptcy case deprived the superior court of jurisdiction over the attorney lien litigation. The court of appeal in affirming the order denying Givens's motion explained that the existence of an automatic stay that may have protected Harris had no bearing on the superior court's jurisdiction over the Wasserman firm's claims against Givens. (*Wasserman, Comden, Casselman & Pearson, LLP v. Givens, supra*, B268664.)

8

did not have standing to pursue its claim or collect its judgment in the attorney lien case, again based on the superior court's purported lack of jurisdiction due to Harris's bankruptcy. The lawsuit was dismissed with prejudice with the court characterizing it as "meritless and frivolous."

In July 2021 Givens made one more attempt to void the judgment in the attorney lien litigation, moving to vacate the judgment on the ground the bankruptcy court, not the superior court, had jurisdiction over the Wasserman firm's claims that he interfered with the firm's contractual rights arising from the Death Row litigation. The court denied the motion on November 1, 2021, stating it "lack[ed] merit procedurally and substantively," and awarded sanctions to the Wasserman firm, ruling the procedural history in the Death Row litigation and the attorney lien litigation "clearly shows the jurisdictional claims pursued by Defendant Givens are not warranted by existing law or its modification."

Givens then attempted to have the Harris bankruptcy case reopened so California state courts would recognize the jurisdiction of the federal bankruptcy court. In the court's December 1, 2021 ruling and memorandum of opinion denying the request to reopen, United States Bankruptcy Judge Geraldine Mund found that Givens had no standing because the attorney lien case in which he was a defendant never involved the bankruptcy estate. In addition, Judge Mund wrote, "Whatever rights the estate had were settled by the Trustee and none exist at this time. The litigation in the Harris v. Knight case has been concluded in the state court. There is no relief to be granted in the bankruptcy court . . . . [¶] This issue has been

decided several times by other courts and I find no grounds to reopen when no relief can possibly be given."

5. *Givens's Attempts on Behalf of Harris To Set Aside the 2005 Default Judgment*

On June 14, 2019 Givens, who, as discussed, had previously represented Knight and Death Row Records in the Death Row litigation and then sought to intervene and set aside the judgment on his own behalf, moved as Harris's counsel to set aside the 2005 default judgment. The trial court initially granted the motion on September 20, 2019, accepting the argument the judgment was void because Harris's claims should have been part of her bankruptcy estate.[7]  On October 1, 2019 the Wasserman firm, asserting standing because of its lien on Harris's judgment and explaining it had not received notice of the motion to set aside, asked the court to reconsider its September 20, 2019 ruling. The court granted the motion for reconsideration on December 12, 2019 and vacated its earlier ruling setting aside the judgment, explaining the Wasserman firm had provided information not disclosed by Harris or Givens, including that the trustee of Harris's bankruptcy estate was aware of the judgment and had ratified it after the fact through settlements in the bankruptcy cases involving the various parties, including Harris and Knight.

In March 2020 the court denied Harris's motion for reconsideration of the December 12, 2019 order vacating its September 20, 2019 ruling.  It denied a second motion to set aside

---

[7]     The superior court judge who entered the 2005 default judgment and denied Givens's efforts to set aside the judgment in 2007 and 2008 retired in 2014.

10

Knight's and Death Row Records' defaults in September 2020 and in October 2020 granted the Wasserman firm's motion for sanctions.

One day after the court awarded the Wasserman firm sanctions, Givens on behalf of Harris filed a new motion to set aside the default. The court again denied the motion, explaining, with a citation to its December 12, 2019 minute order, "Counsel Givens is well aware that the Court previously found that the bankruptcy trustee was aware of Harris' pre-bankruptcy petition interest in the Judgment and ratified it after the fact."[8]

Finally, on March 14, 2022 Givens, on behalf of Harris, filed the motion to set aside a void order pursuant to section 473, subdivision (d), which is the subject of this appeal. Harris did not include her motion in the record on appeal,[9] but, as described by the court in its order denying the motion, Harris again contended the superior court lacked jurisdiction to entertain the Death Row

---

[8]    Harris's appeal of the trial court's September 9, 2020 order denying her motion to set aside default was dismissed for failure to pay the required filing fee. (*Harris v. Wasserman, Comden & Casselman, LLP*, B308872.)

[9]    Using the optional Judicial Council form for designating the record on appeal in limited civil cases, Givens requested that the record include an exhibit attached to Harris's motion (the transcript of the bankruptcy hearing before Judge Mund) but not the motion itself, the Wasserman firm's opposition memorandum or Harris's reply to the opposition memorandum. The Wasserman firm then designated additional documents to be part of the clerk's transcript, including its opposition to Harris's motion but, like Givens, omitted the motion itself and Harris's reply papers.

litigation because the subject matter of the action—damages arising from Harris's alleged ownership interest in Death Row Records—was property that belonged to her bankruptcy estate and the claims could only be asserted by the bankruptcy trustee. As reflected in the court's ruling, Harris's motion—her "new evidence"—was based on statements made by Judge Mund in connection with her December 1, 2021 ruling denying Givens's motion to reopen the Harris bankruptcy case that Harris's claims to an ownership interest in Death Row Records were not "automatically abandoned" because not listed in the bankruptcy schedules in 1996.

The court denied Harris's motion on April 25, 2022.[10] In its ruling the court explained Judge Mund's statements were not in conflict with the reasoning of its own prior order rejecting Harris's jurisdiction claim. Whether or not the claim to an interest in Death Row Records had been automatically abandoned, Judge Mund stated "abandonment is not the issue" and found the trustee "certainly knew about it." Indeed, the superior court reiterated, as the bankruptcy court ruled, Harris and the bankruptcy trustee entered into a settlement with respect to the 2005 default judgment, fully resolving any possible

---

[10] At the outset of its ruling the court observed, "This is the latest groundless attempt by Plaintiff Lydia Harris and her current attorney Dermot Givens, who represented Defendant Gilliam in [the] case, to essentially void this action ab initio for lack of jurisdiction over alleged bankruptcy assets beyond this court's authority, which, if granted could collaterally affect LASC Action No. BC340196 [the attorney lien litigation]—in which a Los Angeles Superior Court rendered a judgment of over $1 million against Dermot Givens . . . ."

jurisdiction issue: "Plaintiff settled her claims with the bankruptcy estate . . . . The U.S. Bankruptcy Court concluded that the bankruptcy estate has settled its affairs and refused to reopen the bankruptcy case."

Harris (still represented by Givens) filed a timely notice of appeal.

## DISCUSSION

1. *Standard of Review*

Section 473, subdivision (d), provides a trial court "may, on motion of either party after notice to the other party, set aside any void judgment or order." "[I]nclusion of the word 'may' in the language of section 473, subdivision (d) makes it clear that a trial court retains discretion to grant or deny a motion to set aside a void judgment." (*Cruz v. Fagor America, Inc.* (2007) 146 Cal.App.4th 488, 495; accord, *Pittman v. Beck Park Apartments Ltd.* (2018) 20 Cal.App.5th 1009, 1020.)[11] The

---

[11] Harris relies on extrinsic evidence—her 1996 bankruptcy filing and statements from subsequent bankruptcy proceedings—to argue the 2005 default judgment is void. Appellate decisions distinguish for purposes of section 473, subdivision (d), between judgments void on the face of the record and those shown to be invalid through extrinsic evidence. (See, e.g., *Pittman v. Beck Park Apartments Ltd.*, *supra*, 20 Cal.App.5th at p. 1021.) These decisions hold a motion to set aside a judgment void on its face may be made at any time in the underlying action but must be challenged within the six-month time limit prescribed by section 473, subdivision (b), or by an independent action in equity if the invalidity can be shown only through consideration of extrinsic evidence. (*Ibid.*; see *OC Interior Services, LLC v. Nationstar Mortgage, LLC* (2017) 7 Cal.App.5th 1318, 1328; *Ramos v. Homeward Residential, Inc.* (2014) 223 Cal.App.4th 1434, 1440.) Whether that distinction is correct is now before the

13

reviewing court "generally faces two separate determinations when considering an appeal based on section 473, subdivision (d): whether the order or judgment is void and, if so, whether the trial court properly exercised its discretion in setting it aside." (*Nixon Peabody LLP v. Superior Court* (2014) 230 Cal.App.4th 818, 822.) The trial court's determination whether an order is void is reviewed de novo; its decision whether to set aside a void order is reviewed for an abuse of discretion. (*Ibid.*; see *Airs Aromatics, LLC v. CBL Data Recovery Technologies, Inc.* (2018) 23 Cal.App.5th 1013, 1018; *Cruz*, at p. 496.)

### 2. *Harris Failed To Demonstrate the 2005 Default Judgment Is Void*

In her appellate briefs Harris argues, as she and Givens have repeatedly done in other fora, that her claim to an ownership interest in Death Row Records was an asset of her bankruptcy estate omitted from the schedules she filed in 1996; that the federal bankruptcy court had exclusive jurisdiction over the claim; and that, as a consequence, the trial court in 2022 should have set aside the 2005 default judgment in the Death Row litigation. In support Harris asserts the December 1, 2021 opinion of the bankruptcy court agreed her claims to an ownership interest remained an asset of the bankruptcy estate. Therefore, Harris argues, her claims were subject to the exclusive jurisdiction of the bankruptcy court and nothing in the record supports a finding the bankruptcy trustee (with the approval of the bankruptcy court) can ratify the superior court's exercise of

Supreme Court in *California Capital Insurance Co. v. Hoehn*, review granted January 25, 2023, S277510. Because we find no merit to Harris's arguments on appeal, we need not address the timeliness of her renewed motion to vacate the judgment.

14

jurisdiction under the circumstances present here (as actually phrased by Harris, "can unilaterally cede the jurisdiction of a federal bankruptcy court to the Superior Court").

Contrary to Harris's recitation, however, the bankruptcy court did not find Harris's claims were currently an asset of a bankruptcy estate. What the court actually said was that Harris's claims of ownership were not automatically abandoned when the bankruptcy case was closed in 1999. Crucially, the court added that the trustee was aware of the claims and "abandonment is not the issue." In other words, as the court emphasized, even if some pre-petition ownership rights had at some point been an asset of the bankruptcy estate, the trustee had fully settled the rights of the bankruptcy estate with respect to the claims, the state court case had been concluded, and neither the estate nor Harris had any further interest in the matter—all points ignored (repeatedly) by Harris.

That was also the analysis of the superior court on December 12, 2019 when it vacated the order it had "mistakenly entered" because Harris failed to disclose pertinent information— that is, that the trustee of Harris's bankruptcy estate was aware of the 2005 default judgment and ratified it through settlement agreements with Harris personally and with the trustees of the bankruptcy estates of Knight and Death Row Records, which were approved by the bankruptcy court. And the court in denying Harris's March 14, 2022 motion accurately stated that nothing in the December 1, 2021 bankruptcy ruling was inconsistent with its prior analysis. In addition, the trustee's 2008 filing in opposition to Givens's attempt to set aside the judgment on his own behalf explained that Harris's post-petition claims (that is, claims relating to her ownership interest in Death

Row Records that arose after May 17, 1996, worth approximately $50 million) were not part of the bankruptcy estate and were properly determined in the superior court action.

Moreover, Harris's argument inverts the parties' burdens on appeal. Because there is a presumption in favor of the validity of the judgment (see, e.g., *Kinney v. Superior Court* (2022) 77 Cal.App.5th 168, 177 ["""[a] judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness""""]), it was Harris's obligation as appellant to demonstrate reversible error. (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609; accord, *Farnum v. Iris Biotechnologies Inc.* (2022) 86 Cal.App.5th 602, 608; *Del Real v. City of Riverside* (2002) 95 Cal.App.4th 761, 766.) "To demonstrate error, appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error. [Citations.] When a point is asserted without argument and authority for the proposition, 'it is deemed to be without foundation and requires no discussion by the reviewing court.' [Citations.] Hence, conclusory claims of error will fail." (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.)

Harris has presented nothing but a conclusory claim of error, citing no legal authority for the proposition that subsequent actions by a bankruptcy trustee, particularly when expressly approved by the bankruptcy court (here, settling all claims relating to Harris's claimed ownership interest in Death Row Records with Harris, Knight and Death Row and the trustees of their bankruptcy estates), cannot effectively preclude a subsequent challenge to a superior court judgment, even if the

underlying claims (or some of them) should have been pursued in federal bankruptcy court.

Harris's additional contention the 2005 default judgment and the April 25, 2022 postjudgment order now on appeal were improperly entered while an automatic stay imposed by federal bankruptcy law was in effect is utterly frivolous.[12] Harris's 1996 bankruptcy case was closed without administration of any assets in December 1999, three years before Harris's initial lawsuit. It was not reopened by motion of the trustee until August 2007— more than two years after Harris obtained the $107 million judgment against Givens's clients. And the reopened bankruptcy proceeding was again closed in December 2015, well before the superior court's repeated rejections of Harris's efforts to set aside the judgment. Not only was there no bankruptcy stay in effect at any material time, but also the automatic stay is not applicable to actions initiated by the debtor. (See *Shah v. Glendale Federal Bank* (1996) 44 Cal.App.4th 1371, 1375; cf. *Danko v. O'Reilly* (2014) 232 Cal.App.4th 732, 748 ["'[T]he automatic stay operates for the benefit of the debtor and trustee only, and gives other

---

[12] "Upon the filing of a bankruptcy proceeding, federal bankruptcy law imposes an automatic stay on all state and federal proceedings outside the bankruptcy court against the debtor and the debtor's property. (11 U.S.C. § 362(a)(1) & (2); [citation omitted].) . . . 'The automatic stay is self-executing and is effective upon filing the bankruptcy petition. (See 11 U.S.C. § 362(a).)' [Citation.] Section 362(a)(3) of title 11 of the United States Code provides for an automatic stay of 'any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate.'" (*Shaoxing County Huayue Import & Export v. Bhaumik* (2011) 191 Cal.App.4th 1189, 1196.)

parties interested in property affected by the automatic stay no substantive or procedural rights. [Citations.] *If the debtor or trustee chooses not to invoke the protections of the automatic stay, no other party may attack any act in violation of the automatic stay*"].) Accordingly, Harris's position is entirely without merit.

    3. *Harris Forfeited Her Additional Claims Challenging the Trial Court's Postjudgment Order*

As further grounds for reversing the order denying her motion to set aside the 2005 default judgment, Harris contends the trial court erred in permitting the Wasserman firm to intervene in the Death Row litigation without adhering to the requirements of section 387, subdivision (c),[13] and the court's order was the product of racial bias. Both arguments have been forfeited.

As discussed, the Wasserman firm on October 1, 2019 moved for reconsideration of the September 20, 2019 order setting aside the 2005 default judgment, asserting it had the right to seek relief because of its lien on the judgment—an entirely appropriate basis for intervention. (See § 387, subd. (d)(1)(B) [court may permit a nonparty to intervene if "[t]he person seeking intervention claims an interest relating to the property or transaction that is the subject of the action and that person is so situated that the disposition of the action may impair or impede that person's ability to protect that interest"].) The court granted the Wasserman firm's motion and vacated its September 20, 2019 order.

---

[13] Section 387, subdivision (c), provides in part, "A nonparty shall petition the court for leave to intervene by noticed motion or ex parte application."

18

Although it is difficult to fathom how any technical irregularity in permitting the Wasserman firm to intervene in the Death Row litigation in light of its attorney lien could be prejudicial—a point Harris does not address—if Harris wanted to object to the intervention, she should have done so in connection with the October 1, 2019 motion and the trial court's December 12, 2019 order granting reconsideration of its September 20, 2019 order. The time for that objection has long since passed. In addition, even if such a procedural challenge were timely, because Harris failed to include a copy of her March 14, 2022 moving papers in the record on appeal, we cannot determine if the issue was properly presented to the trial court and thus preserved for appeal. (See *Cabatit v. Sunnova Energy Corp.* (2020) 60 Cal.App.5th 317, 322 ["[i]f a party fails to raise an issue or theory in the trial court, we may deem consideration of that issue or theory forfeited on appeal"]; *Rancho Mirage Country Club Homeowners Assn. v. Hazelbaker* (2016) 2 Cal.App.5th 252, 264 ["[a]s a general rule, issues not raised in the trial court cannot be raised for the first time on appeal" (internal quotation marks omitted)]; accord, *People v. Covarrubias* (2016) 1 Cal.5th 838, 894.)

As for the charge of racial bias, Harris contends she and Givens are a Black woman and man, the lawyers from the Wasserman firm and its counsel are White, and the court's comments during the hearing on her motion and "nonsensical reasoning" demonstrated its bias. Because Harris did not provide a reporter's transcript or settled statement, we are unable to evaluate any claim based on what occurred during the proceedings in court. (See *Randall v. Mousseau* (2016) 2 Cal.App.5th 929, 935 ["Failure to provide an adequate record on

19

an issue requires that the issue be resolved against appellant. [Citation.] Without a record, either by transcript or settled statement, a reviewing court must make all presumptions in favor of the validity of the judgment"].)[14] And, as discussed, far from being irrational (or nonsensical), the court's reasoning and resulting ruling denying Harris's motion to set aside were entirely proper.

## DISPOSITION

The April 25, 2022 postjudgment order is affirmed. The Wasserman firm is to recover its costs on appeal.

PERLUSS, P. J.

We concur:

SEGAL, J.

FEUER, J.

---

[14] Harris, through her counsel Givens, checked and separately initialed the box on the form designating the record on appeal electing to proceed without a record of the oral proceedings in the trial court. In doing so, she acknowledged the appellate court "will not be able to review any issues I might want to raise about what was said in the trial court during those proceedings."